Anthony T. LEE et al., Plaintiffs,

United States of America et al., Plaintiffs-Intervenors-Appellees,

v.

MONROE COUNTY BOARD OF EDUCATION et al., Defendants,

Monroe County Board of Education, Defendant-Appellant.

No. 79–1981.

United States Court of Appeals, Fifth Circuit.

Unit B

March 27, 1981.

---

William C. Tidwell, III, Kathy M. Dunston, Mobile, Ala., for defendant-appellant.

Soloman S. Seay, Jr., Montgomery, Ala., for National Ed. Assoc. & Homer Williams.

Before GODBOLD, Chief Judge, and TJOFLAT and VANCE, Circuit Judges.

GODBOLD, Chief Judge:

This ancient case involves a dispute between the school board of Monroe County, Alabama, and a black principal arising from the principal's termination on what the district court found to be racially discriminatory grounds. The district court awarded a substantial judgment for back pay, and the Board appeals. We affirm.

In August 1970 Williams' complaint against the Board was asserted by intervenor National Education Association in a motion directed at several aspects of the Monroe County system. The motion alleged racial discrimination in hiring, transfers, promotions, and dismissals with respect to blacks in general and plaintiff and others in particular, and faculty and staff assignments, all in violation of a prior order of the court.

1. In 1968 the three-judge court having jurisdiction over the system found that it was not in

Relief was denied to Williams in 1972. NEA appealed and the appeal was dismissed in late 1972 on jurisdictional grounds.

On remand the case was submitted on a stipulated record. In 1976 the district court denied relief on the basis of its conclusion that Williams had not been demoted but had voluntarily removed himself from consideration for further employment in the system. NEA appealed again, and in 1977 this court vacated and remanded because of lack of findings of fact and conclusions of law. *Lee v. Monroe County Board of Education,* 554 F.2d 1287 (5th Cir. 1977). On remand the case was tried in 1978 along with many other matters involving the Monroe County system.

Prior to 1969 the Monroe County system had a long history of *de jure* segregation.[1] Plaintiff Williams had served in the system since 1954, for approximately seven years as a teacher and for approximately nine years as principal of all-black schools. In 1966 he was assigned as principal of the Vredenburgh Junior High School, a small black school. It was being phased out and by 1968–69 had only elementary grades. At the end of that year it was closed by court order. When Williams was notified of the closing he asked to be considered for any opening "in the area of administration." Three principalships were open in the system for the 1969–70 school year, all in traditionally white schools. The Board was then operating under a 1967 court order that provided:

Teachers and other professional staff members will not be discriminatorily assigned, dismissed, demoted, or passed over for retention, promotion, or rehiring on the ground of race or color. In any instance where one or more teachers or other professional staff members are to be displaced as a result of desegregation, no staff vacancy in the school system will be filled through the recruitment from

compliance with the court's orders.

outside the system unless no such displaced staff member is qualified to fill the vacancy. If as a result of desegregation there is to be a reduction in the total professional staff of the school system the qualifications of all staff members in the system will be evaluated in selecting the staff member to be released without consideration of race or color. A report containing any such proposed dismissals and the reasons therefor shall be filed with the State Superintendent of Education.

The Board had no criteria for determining what to do with the faculties and staffs of schools that were closed pursuant to court orders.

Despite a reduction in principalships, there was not an evaluation of the qualifications of faculty members for the purpose of selecting those members who would fill the vacancies. The former superintendent, since retired, testified that there were no criteria to determine what principals should remain in the system but the Board just left principals where they were. He also testified that in 1969 it was the policy of the Board that black principals were appointed to traditionally black schools.

Williams was given the opportunity to apply for one of the three principalships, but he did not show up for an interview. He was not even given a chance to apply for either of the other two places. All three places were filled by whites. The Board then created a new position, assistant principal at a traditionally black elementary school, one of the largest schools in the system, and offered it to Williams. He responded on June 9 with a letter that the district court found "expressed dissatisfaction" with the offer. Williams asked for a hearing and requested five days notice so his lawyer could be present. On June 13 the Board sent Williams a letter notifying him of a hearing on June 20, but the letter gave no time for the hearing. Williams did not receive the letter until June 20. Though the court made no findings on this point, Williams testified that he went at once to where the Board was meeting and was told the meeting had just ended, that he reiterated his desire for a hearing and was told he would hear from the Board. The same day, June 20, the Board wrote Williams notifying him that the Board interpreted his letter of June 9 as a refusal to accept the assignment and voted to terminate his contract. On June 27 Williams again wrote the Board, stating that his June 9 letter had not refused the new position. He asked for a hearing but none was granted.

With respect to the two positions Williams was not permitted to apply for, the Court made no specific finding that the Board was racially motivated in failing to *consider* him. Rather, it found that the two persons actually selected were better qualified under objective academic criteria, thus, inferentially, the Board would not have chosen Williams if it had considered him. Therefore, the court found, he was not the victim of racial motivation.

With respect to the newly created assistant principalship, Williams' response to the offer of it, and his subsequent discharge, the court found that the evidence we have set out created a rebuttable presumption that the actions of the Board were "imbued with racial considerations", and that the offer to appoint Williams to the newly created job was "racially motivated with the intent to perpetuate the dual school system." The court found that the Board did not rebut this presumption because it offered no explanation why Williams was not considered for one of the principalships in a traditionally white school, and why no white was considered for the assistant principalship that was created. Thus, it found, the Board did not have adequate grounds to dismiss Williams.[2]

2. While not set out as the basis for the court's findings with respect to Williams, the same 1978 order entered on Williams' claim contained a finding that as of 1978 the Monroe County system was in substantial noncompliance with a 1970 court order requiring it to desegregate its staff and faculty.

In its order of March 2, 1979 covering Williams' remedy the district court said:

■ The Board contends that Williams refused the new position. The district court's finding that he did not is amply supported by the evidence. The related contention that Williams was not discharged but voluntarily removed himself from the system is frivolous.

The court found it unnecessary to decide whether the offer of a new job was a demotion. The absence of such a finding is not determinative of the case. Even if the proposed transfer was lateral the court found that the Board acted with the intent to perpetuate the dual school system. Acting under a policy that black principals belonged in black schools, and with two principalships vacant in white schools, the Board created a racially identifiable position in a substantially black school and offered it to Williams. When he expressed dissatisfaction the Board treated his dissatisfaction as refusal and fired him and gave him no hearing on his plea that he had not refused the job.

The Board contends that its actions in creating and offering the new job to Williams were taken for laudable motives to assist Williams when he had no legal right to any consideration from the Board. Or, it contends that at the least its motives were benign. No substantial evidence supports these versions of the facts. The Board asserts that it had no duty to retain Williams in its employ because his position had been abolished. This overlooks the fact that it made no effort to compare qualifications of persons in the system to see who should be retained and had no criteria for dealing

with a situation like that presented except policies of leaving principals where they were and assigning black principals to black schools. Creating a racially identifiable job for Williams that further contributed to a dual school system was not a substitute for failing to honor Williams' constitutional right not to be discriminated against on account of his race.

The Board argues that insufficient causation was proved under *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). That is, even if Williams' rights were violated it has not been shown that he would not have been discharged anyhow. In *Mt. Healthy* there were independent, permissible reasons for the failure to renew plaintiff's contract. Here, there is no evidence, or even suggestion, of any alternative reason for firing Williams.

■ Turning to damages, the district court found that from the time of Williams' termination until the 1973–74 school year he was entitled to the pay of an assistant principal, and therafter to the salary of a principal because in 1973–74 the Board went outside the system and hired as principal a person less qualified than Williams. If the district court made any error in awarding pay it was in limiting Williams to the salary of an assistant principal for the initial years. He has not cross-appealed on this issue, so we leave the district court's calculation as it stands.

[N]o evidence has been given the Court which would have permitted a conclusion that the position taken by the School Board relative to the Williams matter was correct, the evidence preponderating in favor of the conclusion that the School Board deliberately acted in a manner in violation of the plaintiff's constitutional rights. Indeed, the Board, though often urged to do so, has also refused to adopt any plan by which the qualifications of personnel in the teaching or administrative end of the school system can be measured objectively to determine their relative qualifications. The qualifications of Homer Williams, when measured objectively with the qualifications of others in the system or subse-

quently employed, demonstrate that he was equally or better qualified to hold the position that he sought or to which by comparison he is now entitled. If the School Board desires to continue to pursue its policy of employing personnel based on subjective measurement of qualifications against objective measurement and lacks the desire to adopt a uniform policy that would serve to upgrade the qualifications of institutional and supervisory personnel with the concomitant result that it retains mediocrity in these areas, and subjects itself to future law suits, then that is a matter between the citizenry and the elected officials with which this Court will not interfere.

The court found that Williams had mitigated his damages. The record amply supports this finding. He sought employment in two other school systems. He has worked in a grocery store, written insurance as a "debit" agent, worked on construction jobs, worked in a self-help housing program, worked as an employee of a cooperative, and at the time of the remedy hearing in 1978 was employed as a security guard. The argument that he did not mitigate because he did not seek a place in the school systems of counties adjacent to Monroe County is meritless. The contention that he is barred from recovery on grounds of failure to mitigate because he refused the newly created principalship is frivolous. The district court found that he did not refuse, and he could not get a hearing on his contention that he had not refused. Moreover, it would be strange law indeed if one who is denied access to available jobs on racially discriminatory grounds and is offered instead a new position created for racially discriminatory reasons, cannot recover unless he takes the job. The requirement that one mitigate his damages does not override the Constitution.

AFFIRMED.