Justice Stevens,
dissenting.
In both the public and private sector, payroll managers routinely remit portions of employees’ wages to third parties pursuant to the employees’ written instructions. For decades, employers in Idaho had discretion to allow such payroll deductions. In 2003, however, the State enacted the Voluntary Contributions Act (VCA), 2003 Sess. Laws chs. 97 and 340 (codified at Idaho Code § 44-2004 and §§ 44-2601 through 44-2605 (Michie 2003)), which, among other things, prohibits employers from allowing any payroll deduction for “political activities,” § 44-2004(2). For several reasons, I cannot conclude as the Court does that this restriction on payroll deductions was reasonably calculated to further the State’s “interest in separating the operation of government from partisan politics,” ante, at 363. Because it is clear to me that the restriction was intended to make it more difficult for unions to finance political speech, I would hold it unconstitutional in all its applications.
I
“It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys.” Rosenberger v. Rector and Visitors of Univ. of Va., 515 U. S. 819, 828 (1995). On its face, §44-2004(2) restricts payroll deductions for all political activities, and petitioners contend that the State reasonably enacted §44- *371 2004(2) “to avoid either the appearance or the reality of public employer involvement in . . . electoral politics.” Tr. of Oral Arg. 15. Several features of the statute, however, belie its purported viewpoint neutrality.
That the restriction was more narrowly intended to target union fundraising is first evidenced by its statutory context. The other provisions of the VC A with which §44-2004(2) was enacted pertain exclusively to unions.[1] For instance, § 44-2603 requires unions to create separate funds for political activities and places restrictions on unions’ solicitation of political contributions; § 44-2604 makes it a misdemeanor, among other things, for unions to make expenditures for political activities from union dues; and §44-2605 establishes registration and reporting requirements for union political funds. The provisions proximate to §44-2004(2), which were enacted roughly two decades earlier as part of the Right to Work Act, 1985 Sess. Laws ch. 2, §1 (codified at Idaho Code § 44-2001 et seq.), are similarly directed at union activities. Even the subsection immediately preceding § 44-2004(2) is aimed specifically at unions: Section 44-2004(1) prohibits payroll deductions for union dues, fees, assessments, or other charges without an employee’s prior written authorization. And, finally, § 44-2004(2) is codified in a title of the Idaho Code entitled “Labor” and in a chapter entitled “Right to Work.” Together, these statutory features strongly suggest that the Idaho Legislature enacted §44-2004(2) specifically to impede union fundraising.
The statute’s discriminatory purpose is further evidenced by its substantial overinclusiveness and underinelusiveness with respect to the State’s asserted interest in passing the legislation. Petitioners contend that the restriction was *372 enacted to further the State’s interest in avoiding the appearance or actuality of public employer involvement in partisan politics. See Tr. of Oral Arg. 15. But, as enacted, §44-2004(2) prohibited private as well as public employers from making payroll deductions for political activities. As petitioners admitted at oral argument, “the State has no interest in ... private employers’ determination to be involved or not involved in political matters.” Id., at 6. That petitioners conceded the invalidity of § 44-2004(2) as applied to private employers earlier in this litigation does not require us to ignore the breadth of the statute the State enacted in assessing the provision’s scope and purpose. Consideration of the provision actually passed by the legislature makes clear that the State’s asserted interest in the restriction is not compatible with its breadth.
The State’s interest in avoiding the appearance or reality of employer political involvement is also inconsistent with its decision not to restrict deductions for charitable activities. Such deductions will often present a similar risk of creating an appearance of political involvement as deductions for covered political activities. Yet the State has made no effort to distinguish this type of political activity. As with the State’s decision to apply §44-2004(2) to private employers, its failure to apply the restriction to charitable deductions produces a significant mismatch between the restriction’s reach and its asserted purpose.
To my mind, it is clear from these features of the legislation that § 44-2004(2)’s prohibition on payroll deductions for “political activities” was intended to target union political activity. Cf. Chamber of Commerce of United States v. Brown, 554 U. S. 60, 70-71, 73 (2008) (noting that a rule restricting the use of state funds to promote or oppose unionization impermissibly expressed a pro-union preference, thereby chilling one side of the public debate).[2] The majori *373 ty’s facile assertion that the First Amendment does not confer a right to government subsidization of private speech cannot validate an evidently discriminatory restriction on fundraising for political speech.[3]
II
Although the statute’s discriminatory purpose provides an adequate ground for deciding this case, I briefly note my disagreement with the majority’s analysis of §44-2004(2)’s constitutionality as applied to local government employees. The Court of Appeals found this application of the provision invalid due to the State’s failure to show that it “actually operates or controls the payroll deduction systems of local units of government.” Pocatello Ed. Assn. v. Heideman, 504 F. 3d 1053, 1068 (CA9 2007).[4] In the absence of evidence of such control, the Court of Appeals held, “the State has a relatively weak interest in preventing [respondents] from exercising their First Amendment rights.” Ibid.
*374 Unlike the Court of Appeals, the majority omits any examination of the relationship Idaho has established with its political subdivisions. Rather, the majority finds it sufficient to assert that States, as the creators of local government, retain the authority to grant or withdraw subdivision powers and privileges. Ante, at 362. The fact of that authority, however, hardly proves that the particular relationship between a State and its political subdivisions is irrelevant to our constitutional inquiry. All States do not treat their subdivisions the same, and those differences are sometimes consequential.
We have in other contexts recognized the constitutional significance of the relationship a State chooses to establish with its political subdivisions. For instance, in Mt. Healthy City Bd. of Ed. v. Doyle, 429 U. S. 274, 280 (1977), we stated that the answer to the question whether a school board should “be treated as an arm of the State partaking of the State’s Eleventh Amendment immunity ... depends, at least in part, upon the nature of the entity created by state law.” And in McMillian v. Monroe County, 520 U. S. 781, 786 (1997), we held that whether a sheriff has county or state policymaking authority for purposes of determining liability under Rev. Stat. § 1979, 42 U. S. C. § 1983, is ascertained by reference to “the actual function of a governmental official,” which is in turn “dependent on the definition of the official’s functions under relevant state law.” In both cases, the constitutional analysis turned in part on the way the State had structured its relationship with its political subdivisions.
Although we have not previously considered the implications of the state-subdivision relationship in the First Amendment context, we have repeatedly recognized the significance of an analogous inquiry: whether the government, in imposing speech restrictions, is acting in its capacity as regulator or proprietor. See, e. g., Davenport v. Washington Ed. Assn., 551 U. S. 177, 189 (2007); Cornelius v. NAACP Legal Defense & Ed. Fund, Inc., 473 U. S. 788, 805-806 *375 (1985). Accordingly, I cannot agree with the majority’s assertion that, because political subdivisions are instrumentalities of the State, “it is immaterial how the State allocates funding or management responsibilities between the different levels of government,” ante, at 364. Relationships between state and local governments are more varied, and the consequences of that variation are more significant, than the majority’s analysis admits.
Because my conclusion that §44-2004(2) discriminates against labor organizations is sufficient to decide this case, I find it unnecessary to fully consider the implications of Idaho’s relationship with its political subdivisions. Rather, I note the significance of this relationship to urge its careful consideration in future cases.
Ill
The majority avoids acknowledging § 44-2004(2)’s evidently discriminatory purpose only by examining the statute out of context and ignoring its initial applicability to private employers. Considering the provision as enacted, I cannot find it justified as the majority does by “the State’s interest in avoiding the reality or appearance of government favoritism or entanglement with partisan politics,” ante, at 359. The impermissible purpose that quite obviously motivated the enactment of the VC A and fully justified its invalidation as applied to private employers should have produced a judgment in this case holding the entire statute invalid, rather than a judgment producing a new statute that the Idaho Legislature did not enact.
I respectfully dissent.

 Respondents also challenged these provisions of the VCA, and petitioners conceded their invalidity earlier in this litigation, acknowledging that they violated the First Amendment by restricting the ability of labor organizations to solicit political contributions. See Pocatello Ed. Assn. v. Heideman, 504 F. 3d 1053, 1057 (CA9 2007).

 It may even be true that § 44-2004(2) only affects union political activity, as petitioners can point to no evidence that another entity is affected *373 by the statute. See Tr. of Oral Arg. 8. But it is unnecessary to determine whether other entities are actually affected by the restriction in light of its clearly discriminatory purpose.

 The discriminatory nature of §44-2004(2) distinguishes it from the restriction we upheld in Davenport v. Washington Ed. Assn., 551 U. S. 177 (2007) — a decision on which the majority heavily relies. In that case, state law authorized public-sector unions to charge nonmembers an agency fee equivalent to membership dues and to have employers collect that fee through payroll deductions. Respondent challenged the validity of a state ballot initiative requiring public-sector unions to obtain nonmembers’ affirmative authorization before using their fees for political purposes. We held that the affirmative-authorization provision did not violate respondent’s First Amendment rights because it merely placed a viewpoint-neutral limitation on an “extraordinary” state-law entitlement allowing it to collect and spend the money of government employees. Id., at 189-190. By contrast, § 44-2004(2) is not a limitation on a state-law entitlement that specifically benefits unions but rather a union-specific exclusion from a generally available benefit.

 The State conceded at oral argument before the Court of Appeals that it is not the proprietor of local government workplaces or their payroll deduction programs. See 504 F. 3d, at 1065.